IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
January 25, 2005 Session

## STATE OF TENNESSEE v. TERRY EDWARD JONES

**Appeal from the Criminal Court for Sullivan County**
**No. S46,436     Phyllis H. Miller, Judge**

_____

**No. E2004-01300-CCA-R3-CD - Filed May 24, 2005**

_____

Terry Edward Jones pleaded guilty to solicitation of first degree murder, for which he received an eight-year incarcerative sentence. Aggrieved of the trial court's failure to grant his request for alternative sentencing, he brings the instant appeal challenging his manner of service. After a thorough review of the record and applicable law, we affirm the judgment of the trial court.

**Tenn. R. App. P. 3; Judgment of the Criminal Court is Affirmed.**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which GARY R. WADE, P.J., and NORMA MCGEE OGLE, J., joined.

Richard A. Spivey, Kingsport, Tennessee, for the Appellant, Terry Edward Jones.

Paul G. Summers, Attorney General & Reporter; William G. Lamberth, II, Assistant Attorney General; H. Greeley Wells, Jr., District Attorney General; and J. Lewis Combs, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

The defendant, Terry Edward Jones, had been peacefully married to his wife of thirteen years, Teresa Lynne Jones, when he began investigating the prospect of hiring someone to kill her. The defendant had been unsuccessful as a day-trader in stocks and securities and, as a result, had amassed a huge amount of debt: at least $100,000 in credit card debt in his name and at least $600,000 of credit card debt in his wife's name. Ms. Jones was unaware of their precarious financial situation because the defendant had taken out credit cards in her name without her knowledge and had maintained a separate cell phone and post office box through which he dealt with his various creditors. Earlier in their marriage, the defendant and Ms. Jones co-owned a business, and during the course of their ownership of that business, the defendant purchased a $1,000,000 life insurance policy on both their lives. However, Ms. Jones was more heavily insured than the defendant.

When the instant crime occurred, the defendant was working in mobile homes sales in Bristol, Tennessee, when he met a fellow salesperson, Ken Lawson. The defendant learned that Mr. Lawson had a prior assault conviction, and subsequently, the defendant initiated several conversations with Mr. Lawson seeking information about hiring a contract killer to arrange for his wife's murder. The defendant was particularly interested in her murder appearing to be accidental because his insurance policy would allow for a greater payout in the event of an accidental death of an insured.

Concerned about the seriousness and persistence of the defendant's efforts to seek information about hiring someone to kill his wife, Mr. Lawson discussed the matter with his boss. Mr. Lawson's boss in turn contacted one of his family members who was a local law enforcement officer, who in turn contacted the Tennessee Bureau of Investigation. TBI Agent Eddie Nelson was assigned the role of posing as a contract killer and discussing the matter with the defendant. Mr. Lawson, who was participating in the ruse, told the defendant to expect a phone call from one of Mr. Lawson's acquaintances who would kill the defendant's wife for a fee. On March 26, 2002, Agent Nelson, posing as a man named "Josh," used a pay phone to telephone the defendant and left a voice-mail message for him in which Agent Nelson said that he was the person who could help the defendant with an insurance deal. Agent Nelson called the defendant again, and the defendant answered, acknowledged that he had received Agent Nelson's earlier message, and told Agent Nelson he could talk with him if Agent Nelson called back the next day.

On March 27, 2002, Agent Nelson called the defendant again, and they arranged to meet the next day in a convention center parking lot. During this conversation, the defendant told Agent Nelson that he was extremely interested in arranging this deal. The next day, March 28, 2002, Agent Nelson met the defendant in the parking lot. Again, the defendant reiterated that he was very interested in this deal and that Agent Nelson could come to his house to "see that [the defendant] was for real." The defendant confirmed that he did indeed want his wife killed so that he could collect some insurance money. The defendant explained that he wanted the death to look accidental, and the defendant told Agent Nelson where his wife worked, how to get there, and what vehicle she would be driving to and from work. The two discussed Agent Nelson's fee, which the defendant explained would be $100,000 if the death looked accidental. Agent Nelson then requested that he receive $300-$500 up front so that he could make some preliminary arrangements, such as renting a car. The two then parted company and arranged to meet again the next day, at which time the defendant would provide the money, a copy of the insurance policy, and a picture of Ms. Jones to Agent Nelson.

On March 29, 2002, Agent Nelson once again contacted the defendant and arranged for a meeting in the convention center parking lot. When the defendant arrived, Agent Nelson asked him if he had his wife's picture, and the defendant responded that he could provide one later that afternoon. Agent Nelson asked the defendant if he had the money, and he explained that he brought $500 with him. The defendant agreed to give Agent Nelson the money and name a date by which he wanted his wife dead, but when pressed to give Agent Nelson the money, the defendant responded that "things didn't feel right." When Agent Nelson asked the defendant if he still intended to go

through with their deal, the defendant responded that he did and that he would leave the money for Agent Nelson in an envelope under a nearby trash can the next day. When the defendant began walking back to his vehicle, TBI agents arrested him. Agents searched the defendant's vehicle and discovered two envelopes, one with $500 and a work schedule and the other with blank pieces of paper. TBI agents had made audio and visual recordings of all of the conversations between the defendant and Agent Nelson.

The defendant accepted a plea offer from the state, pleaded guilty to solicitation to commit first degree murder, and received a Range I, eight-year sentence with the manner of service left to the discretion of the trial court. The trial court conducted an alternative sentencing hearing to determine if the defendant was a suitable candidate to receive an alternative sentence.

The defendant, his mother, his brother, and his cousin all testified on behalf of the defendant at his alternative sentencing hearing. The defendant testified that at the time he committed the crime in question, he was severely depressed and for some time had been taking various prescription medications to treat his depression. The defendant testified that he had taken Xanax, Lortab, the prescription sleep aid Ambien, and various over-the-counter medications. However, questioning by the court revealed that the defendant had no current prescriptions for these medicines. The defendant testified that he had been taking medications prescribed to his wife, which had been originally prescribed by her Illinois physician, who apparently continued to refill them over the years that the defendant and his wife had lived in Tennessee.

The defendant also testified that since his arrest, he had found other employment and was currently employed. The defendant also explained that on the day of his arrest, he did not intend to go through with hiring "Josh," the contract killer. However, based on a conversation with Ken Lawson, the defendant believed that if he failed to go through with the deal, he and his family would be killed. For that reason, he brought the envelope with the blank pieces of paper, which he intended to give to Agent Nelson. The defendant could not explain, however, why he offered to take Agent Nelson to his home if he was deathly afraid of Agent Nelson.

The defendant's mother, brother, and cousin all testified that they believed that the defendant was a good person and that this incident was extremely out of character for him. They described him as dependable and someone always willing and ready to help another in need.

At the conclusion of the testimony, the trial court denied the defendant's request for probation. The court found two mitigating factors applicable to the defendant's sentence: that he had no prior criminal record and that he had a good employment history. The court further found one enhancement factor applicable to the defendant's sentence, that he abused a position of private trust. The court placed great weight on the enhancement factor when denying alternative sentencing. *See* Tenn. Code Ann. § 40-35-115(16) (2003).

The defendant appeals the lower court's denial of his request for alternative sentencing on the following grounds: (1) that the court improperly applied enhancement factor (16);

(2) that the court improperly found that the defendant's crime of solicitation of first degree murder was a violent crime thereby rendering him ineligible for a community corrections sentence; (3) that the court improperly relied on deterrence as a basis for denying the defendant's alternative sentencing request; and (4) that the court applied improper weight to or failed to properly balance the applicable enhancement and mitigating factors.

When there is a challenge to the length, range, or manner of service of a sentence, it is the duty of this court to conduct a *de novo* review of the record with a presumption that the determinations made by the trial court are correct. Tenn. Code Ann. § 40-35-401(d) (2003). This presumption is conditioned upon the affirmative showing in the record that the trial court considered the sentencing principles and all relevant facts and circumstances. *State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991). "The burden of showing that the sentence is improper is upon the appellant." *Id*. In the event the record fails to demonstrate the required consideration by the trial court, review of the sentence is purely *de novo*. *Id*. If appellate review reflects that the trial court properly considered all relevant factors and that its findings of fact are adequately supported by the record, this court must affirm the sentence, even if we would have preferred a different result. *State v. Bolling*, 75 S.W.3d 418, 420 (Tenn. Crim. App. 2001).

In making its sentencing determination, the trial court, at the "conclusion of the sentencing hearing" and after determining the range of sentence and the specific sentence, then determines the propriety of sentencing alternatives by considering (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on the enhancement and mitigating factors; (6) any statements the defendant wishes to make in the defendant's behalf about sentencing; and (7) the potential for rehabilitation or treatment. *Id.*; *see* Tenn. Code Ann. §§ 40-35-210(a), (b), -103(5) (2003).

A defendant who "is an especially mitigated or standard offender convicted of a Class C, D, or E felony is presumed to be a favorable candidate for alternative sentencing options in the absence of evidence to the contrary." Tenn. Code Ann. § 40-35-102(6) (2003). Our sentencing law also provides that "convicted felons committing the most severe offenses, possessing criminal histories evincing a clear disregard for the laws and morals of society, and evincing failure of past efforts at rehabilitation, shall be given first priority regarding sentences involving incarceration." *Id.* § 40-35-102(5). Thus, a defendant who meets the above criteria is presumed eligible for alternative sentencing unless sufficient evidence rebuts the presumption. However, the Act does not provide that all offenders who meet the criteria are entitled to such relief; rather, it requires that sentencing issues be determined by the facts and circumstances presented in each case. *Bolling*, 75 S.W.3d at 420.

Consideration of the evidence and information offered on the enhancement and mitigating factors is relevant to a determination of "the appropriate combination of sentencing alternatives that shall be imposed on the defendant." Tenn. Code Ann. § 40-35-210(b)(5) (2003);

*see Bolling*, 75 S.W.3d at 421; *Donald Higbee v. State*, No. 03C01-9808-CR-00286, slip op. at 7 (Tenn. Crim. App., Knoxville, Dec. 3, 1999).

We first note that the record demonstrates that the lower court considered the sentencing principles and all relevant facts and circumstances; therefore, the court's findings will be afforded a presumption of correctness. *See Ashby*, 823 S.W.2d at 169. Furthermore, we conclude that the defendant is not presumed to be a favorable candidate for alternative sentencing because he stands convicted of a Class B felony. *See* Tenn. Code Ann. § 40-35-102(6) (2003). When there is no presumption of favorable candidacy for alternative sentencing, the state is not required to justify a sentence involving incarceration; instead, the defendant bears the burden of demonstrating to the trial court that he is deserving of a sentence other than one of total confinement. *See id.* § 40-35-303(b)*; see also State v. Jerry Lee Miller*, No. E2002-01921-CCA-R3-CD, slip op. at 4 (Tenn. Crim. App., Knoxville, Mar. 20, 2003).

<u>Abuse of Private Trust</u>

In his first allegation of error, the defendant complains that the trial court erroneously applied enhancement factor (16), that the defendant abused a position of private trust, Tenn. Code Ann. § 40-35-114(16) (2003), when denying his request for alternative sentencing. Specifically, the defendant argues that this enhancement factor cannot be applied merely because a marital relationship existed at the time of the crime; rather, there must be a showing that the existence of this relationship made the victim "particularly vulnerable." *See State v. Gutierrez*, 5 S.W.3d 641, 645-46 (Tenn. 2001) (holding that abuse of private trust may only enhance the sentence of a defendant whose crime victimized the defendant's co-habitator or spouse if the sentencing court examines the nature of this relationship and determines that the relationship "promoted confidence, reliability, or faith," thereby creating a vulnerability that the defendant exploited to commit the crime at issue).

The state counters that the instant case is factually distinguishable from *Gutierrez* because the defendant and his wife, unlike Gutierrez and his co-habitating female friend, had been married and lived together for over a decade before the defendant decided to hire someone to kill his wife. *See id.* at 643. Furthermore, the state argues that the present case is distinguishable from cases in which this court has found that the deteriorating relationship between a defendant and his spouse-victim eroded any basis of private trust and, accordingly, left no grounds for a finding of an abuse of private trust. *See, e.g., State v. Paul Graham*, No. M2003-00331-CCA-R3-CD, slip op. at 15 (Tenn. Crim. App., Nashville, Apr. 7, 2004) (finding that the trial court improperly applied the enhancement factor of abuse of trust when the relationship was a "marriage in its terminal stages"). The defendant in the instant case, by all accounts, had a stable marriage, thereby maintaining a basis of trust, and the state argues that this relationship, therefore, left the victim particularly vulnerable.

Applying the precedent of *Gutierrez* to the instant case, we hold that the lower court improperly found that the abuse of private trust enhancement factor was applicable to the defendant's sentence. *Gutierrez* instructs that the mere sharing of a household or the mere existence of a relationship between two competent adults, such as the defendant and the victim in the present case,

does not render the defendant-perpetrator "more culpable than one who has a different relationship or no relationship with the victim." *Gutierrez*, 5 S.W.3d at 645-46; *see also id.* at 646 n.8, n.9 (noting that "common experience teaches that relationships vary, and great difficulty arises from sincere efforts to categorize any relationship, for things are not always as they seem"; thus, "other things being equal, the murder of a family member is no more culpable than the murder of a stranger"). Rather, the relevant inquiry is whether the relationship in question "'promote[s] confidence, reliability, or faith'" and therefore includes a degree of vulnerability that the defendant-perpetrator in turn exploited to commit the crime at issue. *Id.* at 646 (quoting *State v. Kissinger*, 922 S.W.2d 482, 488 (Tenn. 1996)). In the instant case, the trial court made no finding that the defendant exploited his wife's particular vulnerability to arrange for her murder; the court merely relied on the existence of the marital relationship to establish a basis for the application of this factor.[1] Accordingly, the consideration of this enhancement factor was in error.

However, although enhancement and mitigating factors are properly considered when determining whether to grant an alternative sentence, s*ee* Tenn. Code Ann. § 40-35-210(b)(5) (2003), consideration of these factors is not as critical to an alternative sentencing determination as it would be in a sentencing length determination, wherein the failure to apply a relevant mitigating factor or the application of an irrelevant enhancement factor automatically constitutes error, *see, e.g., State v. Sherry L. Williams*, No. E2002-01288-CCA-R3-CD, slip op. at 6-11 (Tenn. Crim. App., Knoxville, Feb. 13, 2003). Accordingly, we hold that the lower court's consideration of an inappropriate enhancement factor does not *per se* render the court's denial of alternative sentencing erroneous.

Moreover, the court made sufficient findings on the record to support a denial of alternative sentencing. The court found that the defendant had not shown remorse for his crime and that he had been untruthful with the court about the state of his mental health. Specifically, the court found that the defendant's claim to have been heavily under the influence of prescription drugs at the time he planned and committed the instant crime was untruthful. Furthermore, the court found the defendant's claim that he did not intend to hire Agent Nelson to kill his wife at the time of his arrest to be untruthful, as well. Dishonesty with the court and a lack of remorse are factors that weigh against a defendant's potential for rehabilitation or treatment, and accordingly support a denial of an alternative sentencing request. *See State v. Patty Pace Purkey*, No. E2000-00308-CCA-R3-CD, slip op. at 5 (Tenn. Crim. App., Knoxville, Feb. 13, 2001) (defendant's lack of remorse is a valid basis for denying alternative sentencing); *State v. Zeolia*, 928 S.W.2d 457, 463 (Tenn. Crim. App. 1996) (defendant's dishonesty with the court is a valid basis for denying alternative sentencing).

---

[1] The defendant's pre-sentence report revealed that the defendant provided, or promised to provide, the undercover officer with the make and model of the car that the victim would be driving, her work schedule, information about the surveillance system at her workplace, when she would be taking out-of-town trips, and a picture of her. Perhaps the defendant would not have had access to all of this information had he not had an intimate marital relationship with the victim. However, the sentencing court did not accredit this information contained in the pre-sentence report and made no findings in accordance therewith.

<u>Eligibility for Community Corrections Placement</u>

Next, the defendant alleges that the trial court improperly classified him as a violent offender and accordingly found him ineligible to serve his sentence in the Community Corrections Program. *See* Tenn. Code Ann. § 40-36-106(a)(1)(F) (2003) (excluding persons who "demonstrate a pattern of committing violent offenses" from eligibility for a community corrections sentence). The defendant asserts that he is not a violent offender; he was convicted of solicitation to commit first degree murder and not first degree murder or attempted first degree murder. Simply put, the defendant argues that because he hired someone to commit a violent crime and did not intend to commit the crime himself, he should not be classified as a violent offender because he does not pose a threat to commit future violent acts himself. The state counters that the trial court correctly classified the defendant as a violent offender because although the defendant did not plan to murder his wife himself, he fully intended to accomplish her murder by hiring another to kill her.

This court has previously held that solicitation to commit first degree murder is a crime against a person and therefore is properly categorized as a violent felony offense. *See State v. Amy Renee Marcum*, No. 03-C-01-9508-CR-00244, slip op. at 9 (Tenn. Crim. App., Knoxville, Sept. 25, 1996); *State v. James Kenneth Spry*, No. 01-C-01-9409-CC-00309, slip op. at 7 (Tenn. Crim. App., Nashville, June 15, 1995). A defendant convicted of a violent felony offense is ineligible to receive a community corrections sentence. *See* Tenn. Code Ann. § 40-36-106(a)(1)(F) (2003); *see also Amy Renee Marcum*, slip op. at 9; *James Kenneth Spry*, slip op. at 7. Accordingly, we hold that the trial court properly concluded that the defendant was ineligible to receive a community corrections sentence.

<u>Deterrence as a Basis for Denial of Alternative Sentencing Request</u>

The defendant argues that the trial court improperly denied his alternative sentencing request on the basis that a term of confinement was necessary to deter future similar criminal conduct. Specifically, the defendant contends that the court failed to conduct the two-prong analysis outlined in *State v. Hooper*, 29 S.W.3d 1, 10 (Tenn. 2000), that serves as a basis for denying an alternative sentence to deter future conduct. Specifically, the defendant asserts that no proof was introduced and the trial court did not find that solicitation to commit first degree murder had become a noted problem in the defendant's community. The state responds by arguing that the trial court properly found that an incarcerative sentence was necessary to deter future conduct and to prevent depreciation of the seriousness of the offense.

The test articulated in *Hooper* must be applied by a reviewing court when deterrence is the sole basis for ordering a defendant to serve a term of confinement. *See id.* (when deterrence is sole basis for ordering confinement, record as a whole should demonstrate that a need to deter the crime exists in the particular community, jurisdiction, or state as a whole). Conversely, in the instant case, the trial court found several bases for denying the defendant's request for alternative sentencing, including the defendant's unamenability to rehabilitation, as evidenced by his untruthfulness with the court and lack of remorse, and the need to avoid depreciation of the

seriousness of the offense. Earlier in this opinion, we addressed the applicability of this factor and determined that the trial court properly based its denial of probation on its finding that the defendant did not demonstrate an amenability to rehabilitation. Next, we hold that the trial court properly found that an incarcerative sentence is needed to avoid depreciation of the severity of the crime of solicitation to commit first degree murder. *See, e.g., State v. Stacy McKinley Taylor*, No. E2003-02458-CCA-R3-CD, slip op. at 15 (Tenn. Crim. App., Knoxville, Dec. 29, 2004) (noting that a decision to deny alternative sentencing based on a need to avoid depreciating the seriousness of the offense must turn on the nature and circumstances of the offense). As discussed *supra*, solicitation to commit first degree murder is a violent offense, *see Amy Renee Marcum*, slip op. at 9, and we believe that an eight-year incarcerative sentence, the minimum sentence within the defendant's applicable sentencing range, *see* Tenn. Code Ann. § 40-35-112(a)(2) (2003), is not excessive given the facts of this case.

### Application of and Weight Given to Enhancement and Mitigating Factors

In his final allegation of error, the defendant argues that the trial court failed to apply one mitigating factor and failed to adequately weigh other factors. Specifically, the defendant alleges that the court failed to apply mitigating factor (8), that the defendant was suffering from a mental condition, his severe depression and resulting dependency on prescription drugs, which reduced his culpability, and that the court gave inadequate weight to two mitigating factors that it found applicable, the defendant's excellent work history and his lack of a prior criminal record. *See* Tenn. Code Ann. § 40-35-113(8), (13) (2003). The state counters that the trial court's determination of the applicability of the various enhancement and mitigating factors is correct and that the court correctly found that those mitigating factors that were applicable to the defendant's sentence should receive little weight.

Regarding mitigating factor (8) and the defendant's claim that his depressed state and resulting prescription drug abuse diminished his culpability, we note that the trial court found that the defendant's assertions that he was abusing prescription drugs at the time of the crime were not credible. The trial court was in the best position to judge the defendant's demeanor and credibility. Noting that our review of the record supports this finding, we conclude that the court did not err by failing to consider this mitigating factor.

In regards to the defendant's contention that the court failed to give adequate weight to two applicable mitigating factors, the defendant's excellent work history and his lack of a prior criminal record, we remind the defendant that the weight given to enhancement and mitigating factors is a matter entrusted to the sound discretion of the trial court. *See State v. Palmer*, 10 S.W.3d 638, 646 (Tenn. Crim. App. 1999). In the present case, the defendant's eight-year incarcerative sentence is not excessive given the facts surrounding the convicted offense.

In sum, we conclude that the defendant has not met his burden of establishing suitability for total probation or alternative sentencing, and nothing persuades us that the length of

sentence imposed was improper.  Accordingly, we see no reason to disturb the sentence imposed by the trial court.

_____
JAMES CURWOOD WITT, JR., JUDGE
